**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**WILLIE STRINGFIELD, III,**

         **Plaintiff,**

**v.**                                        **Civil Action No. 2:11cv12**
                                                      **(Judge Bailey)**

**LT. R. BRAINSON,[1]**
**WARDEN JAMES CROSS,**
**CAPTAIN T. BERGAMI,**

         **Defendants.**

## REPORT AND RECOMMENDATION

### I. Procedural History

On February 14, 2011, the *pro se* plaintiff filed a civil rights complaint against the above-named defendants. On February 23, 2011, Plaintiff was granted leave to proceed *in forma pauperis*. On preliminary review of the file, the undersigned determined that summary dismissal was not appropriate at that time and directed the United States Marshal Service to serve the Complaint.

On October 17, 2011, the defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. Because Plaintiff is proceeding *pro se*, the Court issued a Roseboro Notice on October 20, 2011.[2] Plaintiff filed a response to the defendants' motion on December 27, 2011.

### II. Contentions of the Parties

**A. The Complaint**

In the complaint, Plaintiff asserts that while incarcerated at USP Hazelton, he was the victim of excessive force on three separate occasions at the hands of Lt. Brinson. Specifically, he alleges

---

[1] Although the plaintiff refers to Lt. Brainson throughout his complaint, this defendant's name is actually Lt. Brinson, and is referred to as such throughout the body of this Report and Recommendation.

[2] Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (finding that the court must inform a *pro se* plaintiff of his right to file material in response to a motion for summary judgment).

that on September 19, 2009, he was housed in the Special Housing Unit ("SHU"), when Lt. Brinson closed his hand inside the food slot, sprayed him with gas, rushed into the cell and started beating and kicking him, and then placed him in restraints without hearing what he had to say. Plaintiff also alleges that on October 12, 2009, Lt. Brinson and others used excessive force after he decided to go on a hunger strike. In particular, Plaintiff alleges that Lt. Brinson and other officers forced his arms over his head causing his shoulder to dislocate. Finally, he alleges that on November 1, 2009, while he was in four-point restraints, Lt. Brinson entered his cell and applied additional restraints with additional pressure around his wrists. Plaintiff further alleges that Lt. Brinson placed his entire body weight on his face and head cutting off his breathing. He also alleges that Lt. Brinson placed his fingers inside his ears and pulled on his head causing him additional pain. Plaintiff also alleges that when Lt. Brinson tightened the restraints, he felt the bones in his wrists crack. Additionally, he alleges that Lt. Brinson took his institutional keys and dug them into three of his fingers and the inside of his hands causing them to bleed. Finally, Plaintiff alleges that although medical staff informed Lt. Brinson that the restraints were too tight, he replied that there was nothing he could do. For relief, Plaintiff seeks monetary damages.

**B.   The Defendant's Motion**

In their memorandum in support of their motion to dismiss or, in the alternative, for summary judgment, the defendants argue that Plaintiff's complaint should be dismissed for the failure to state a claim for which relief may be granted. In support of that argument, the defendants assert:

(1) Plaintiff has failed to establish a claim of excessive use of force;

(2) The defendants are entitled to qualified immunity;

(3) Any Bivens claims against the defendants in their official capacity are barred by

sovereign immunity;

(4) Plaintiff has failed to exhaust his administrative remedies with respect to a second use of force on September 19, 2011; and

(5) <u>Bivens</u> liability cannot be premised on the theory of *respondeat superior*.

**C.   The Plaintiff's Response**

In his response to the motion to dismiss or, in the alternative, motion for summary judgment, Plaintiff alleges that there are genuine issues of material fact such that summary judgment is not appropriate. In support of this contention, Plaintiff has submitted a declaration and points to various discrepancies in the materials submitted by the defendants.

### III.   Standard of Review

**A.   Motion to Dismiss**

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. <u>Mylan Labs, Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir.1993); <u>see also</u> <u>Martin</u>, 980 F.2d at 952.

The Federal Rules of Civil Procedure "require only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). Courts long have cited the "rule that

3

a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [a] claim which would entitle him to relief." Conley, 355 U.S. at 45-46. In Twombly, the United States Supreme Court noted that a complaint need not assert "detailed factual allegations," but must contain more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555 (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," id. (citations omitted), to one that is "plausible on its face," id. at 570, rather than merely "conceivable." Id. Therefore, in order for a complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." Bass v. E.I.DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir.2003) (citing Dickson v. Microsoft Corp., 309 F.3d 193, 213 (4th Cir.2002); Iodice v. United States, 289 F.3d 279, 281 (4th Cir. 2002)). In so doing, the complaint must meet a "plausibility" standard, instituted by the Supreme Court in Ashcroft v. Iqbal, where it held that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully" in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id.

**B. Summary Judgment**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 *1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248. To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, 477 U.S. at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a

5

rational trier of fact to find for the nonmoving party." Matsushita, 475 U.S. at 587 (citation omitted).

## IV. Analysis

### A. Warden Cross and Captain Bergani

Liability in a Bivens case is "personal, based upon each defendant's own constitutional violations." Truloch v. Freeh, 2755 F.2d 391, 402 (4th Cir. 2001) (internal citation omitted). Thus, in order to establish liability in a Bivens case, the plaintiff must specify the acts taken by each defendant which violate his constitutional rights. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Colburn v. Upper Darby Township, 838 F.2d 663, 666 (3d Cir. 1988). Some sort of personal involvement on the part of the defendant and a causal connection to the harm alleged must be shown. See Zatler v. Wainbright, 802 F.2d 397, 401 (11th Cir. 1986). *Respondeat superior* cannot form the basis of a claim for violation of a constitutional right in a Bivens case. Rizzo v. Good, 423 U.S. 362 (1976).

Here, Plaintiff does not allege any personal involvement on the part of these defendants. In fact, beyond naming them as defendants, he never mentions them in the body of his complaint. Accordingly, Plaintiff appears to name them only in their official capacities as the warden of USP Hazelton and staff captain. However, a suit against government agents acting in their official capacities is considered a suit against the United States itself. See Kentucky v. Graham, 473 U.S. 159, 165 (1985) ("Official-capacity suits . . . 'generally present only another way of pleading an action against an entity of which an officer is an agent.'"). Thus, remedy under Bivens is not available against these defendants in their official capacity, and they should be dismissed with prejudice as defendants in this action.

## B. Lt. Brinson/Excessive Force

Analysis of a claim for use of excessive force begins with "identif[ication of] the specific constitutional right allegedly infringed by the challenged application of force." Graham v. Connor, 490 U.S. 386, 394 (1989). In the context of a claim by a prisoner that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments. The validity of the prisoner's claim must "be judged by reference to th[is] specific constitutional standard...rather than to some generalized 'excessive force' standard." Graham v. Connor, supra at 394; *see e.g*, Whitley v. Albers, 475 U.S. 312, 318-326 (1986)(claim of excessive force to subdue convicted prisoner is to be analyzed under an Eighth Amendment standard).

A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect. *See* e.g.*,* Hudson v. McMillian, 503 U.S. 1, 7-8 (1992). The subjective component of the claim requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. Wilson v. Seiter, 501 U.S.294, 299 (1991). When prison officials are accused of using excessive force, the "wantonness" issue turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7 (internal quotation marks omitted).

The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of "contemporary standards of decency." Hudson, 503 U.S. at 8. In assessing this component, the court must ask whether "the alleged wrongdoing was objectively 'harmful enough'

to establish a constitutional violation." Id. (quoting Wilson, supra at 298). When prison officials use force to cause harm maliciously and sadistically, "contemporary standards of decency always are violated... This is true whether or not [sic] significant injury is evident." Hudson, 503 U.S. at 9. However, the Eighth Amendment's prohibition against cruel and unusual punishment does not extend to "*de minimus* use of physical force provided that the use of force is not the sort repugnant to the conscience of mankind." Id. at 10 (internal quotation marks omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Id. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973).

As previously noted, Plaintiff identified three separate incident in the SHU at Hazelton during which he alleges that Lt. Brinson used excessive force. However, a review of the materials supplied by the defendants clearly establish that the force used was applied in good faith in an effort to restore discipline and order.

1. September 19, 2009

The first incident was on September 19, 2009 when staff at USP Hazelton executed a forced cell move of Plaintiff which began at approximately 11:00 a.m.[3] (Doc. 35-4, p. 2). The move was videotaped, and David Wilson[4] reviewed the tape and submitted a Declaration outlining the events depicted on the tape. (Id.). According to the Declaration, Plaintiff refused to be placed in hand restraints. (Id.). More specifically, staff attempted to gain Plaintiff's cooperation to submit to hand

---

[3]There was apparently a second incident that same day at approximately 3:00 p.m. However, the plaintiff only mentions one incident which he identified as occurring at approximately 12:00. Moreover, the plaintiff did not file a grievance which corresponds with the 3:00 incident. Therefore, the undersigned has restricted his analysis to the incident occurring earlier on the 19th.

[4]Mr. Wilson is employed by the BOP as the Mid-Atlantic Regional Correctional Services Administrator and has general oversight of all aspects regarding the safety and security at each institution within the Mid-Atlantic Region. (Doc. 35-4, p.1).

restraints, but he refused. (Id.). Moreover, Plaintiff was in his cell holding his food slot open and threatening to throw an unknown substance thought to be feces and urine on the staff if they walked past his door. (Id.). Accordingly, staff was unable to conduct 30 minute rounds and count the unit. Prior to any use of force, Lt. Brinson and Harold Boyles, the Health Service Administrator, approached Plaintiff's cell and asked him to come to the door to cuff up. (Id.). HSA Broyles repeated the request three times. (Id.). Despite several attempts by HSA Broyles, Plaintiff refused to cooperate and, importantly, kept his window blocked so that staff could not see into his cell. (Id. at 3). Therefore, the use of force team put on its masks and initiated the battering ram and were able to close the food slot. (Id.). Lt. Brinson again directed Plaintiff to cuff up and observed that he appeared to have a towel on his head. (Id.). Lt. Brinson asked Plaintiff to take the towel off his head and cuff up. (Id.). Plaintiff placed his hands through the food slot as if to cuff up but refused to take the towel off of his head. (Id.). Lt. Brinson asked Plaintiff several more times to take the towel of his head. (Id.). Plaintiff continued to refuse Lt. Brinson's order, and therefore, a member of the team was instructed to shoot a chemical agent into his cell. (Id.). Lt. Brinson asked Plaintiff again to remove the towel from his head, and Plaintiff again refused.(Id.). Next, Lt. Brinson told Plaintiff the team would be entering his cell, and then instructed the force team to enter. (Id.). The team entered the cell, tackled Plaintiff, removed the towel from his head (fearing he had a hidden weapon), and began to secure Plaintiff. (Id.). The team moved Plaintiff to a shower to be decontaminated after exposure from the chemical agent. (Id.). The team washed his face, changed his clothes, and applied new restraints. (Id.). A nurse verified Plaintiff had no injuries, had good circulation, and was

9

breathing. (Id. at 4). The team restrained him on a bed of his new cell and locked the door. (Id.).[5] Upon later review, it was concluded Plaintiff had not received any injuries during the forced move. (Doc. 35-9, p. 3).

Plaintiff's bald assertions notwithstanding, there is no evidence to suggest that Lt. Brinson closed Plaintiff's hand inside the food slot or rushed into the cell and started beating and kicking him. Finally, although chemical pellets were fired into his cell, such action was used only after he repeatedly failed to follow instruction from Lt. Brinson and was in compliance with protocol established by the BOP. Therefore, with respect to this incident, it is clear that the forced used was applied in a good-faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm.

2.  October 12, 2009

The second alleged incident occurred on October 12, 2009, when USP Hazelton staff executed a use of force to restrain Plaintiff from hurting himself. (Doc. 35-12, p. 4). Unlike the alleged incidents on September 19, 2009 and November 1, 2009, there is no video tape due to a camera malfunction during the incident. (Doc. 35-3, p. 1). At approximately 7:52 p.m., a Medical Emergency was called in the SHU, when Plaintiff was observed by staff tying a homemade rope from to the window frame and then around his neck. (Doc. 35-6, p. 65).[6]

Prior to this incident, Plaintiff had been threatening to hurt himself. (Doc. 35-10, p. 91). Also, Plaintiff had been on a hunger strike since September 29, 2009. (Doc. 35-9, p. 4). Once prison

---

[5]The pro se law clerk assigned to this matter reviewed the video tape of this incident and confirmed that the Declaration submitted by Mr. Wilson accurately conveys the contents of the video.

[6]A chain of custody log indicates that a noose was found in SHU Cell 102 at 8:30 p.m. October 12, 2009, and logged into the evidence locker at 1:30 a.m. on October 13, 2009.

staff entered the cell, Plaintiff resisted, and was placed in four-point restraints. (Doc. 35-9, p. 4). Plaintiff argues that during this incident his shoulder was dislocated (Doc. 1, p. 3). However, an injury assessment encounter was performed in the SHU at 9:21 p.m. Plaintiff stated that he would continue to harm himself by banging his head and other available means. The medical examination revealed only old superficial lacerations to the left forearm and a quarter size abrasion and area of swelling to the center of the forehead. Plaintiff displayed no new injuries and had no signs of ligature marks to the neck area. Food and fluids were offered and declined. His left arm restraint was loosened by the lieutenant allowing appropriate circulation to all four extremities. Concern was noted over marked decrease of range of motion for the upper extremities which was discussed with the SHU lieutenant. The lieutenant was to discuss with the captain how to formulate a plan to maintain safety and allow for adequate circulation/range of motion. The lieutenant also contacted psych for immediate evaluation of Plaintiff's continued intent for self harm. (Doc. 35-10, p. 91). Although Plaintiff alleges that his shoulder was dislocated during this incident, the medical evidence establishes only that he had limited range of motion in his upper extremities, and forty-eight hours after the incident, he verbalized no medical complaints to medical staff. (Doc. 35-10, p. 81).

Therefore, beyond Plaintiff's blanket allegation that excessive force was used, the medical records and other exhibits fail to support his claim. Again, it appears that the force used was only that necessary to gain control over Plaintiff to prevent him from harming himself.

3. <u>November 1, 2009</u>

The third alleged incident occurred on November 1, 2009 when USP Hazelton executed a forced move on Plaintiff which began at 1:24 p.m. (Doc. 35-4, p. 6). As on September 19, 2009, the

11

move was videotaped, and again Davis Wilson[7] reviewed the tape and submitted a Declaration outlining the events depicted on the November 1, 2009 tape. On the tape, Plaintiff is instructed to open the food slot and submit to hand restraints. (Id.). He obliged and was escorted by the force team to another cell. (Id.). Plaintiff became irate when he claimed his new cell contained feces on the wall. (Id.) According to the video and statements by prison staff, there was no evidence of fecal matter in Plaintiff's cell. (Id.). Plaintiff began to physically resist the force team and was placed on a bed in four-point restraints. (Id.). Once he was restrained, he threatened to bite one member of the force team's finger off and threatened to spit on a member of the force team. (Id.). In response, the force team held a shield over Plaintiff's face. (Id. At 7). The force team continued to place restraints on Plaintiff until he was securely fastened on the bed of his new cell. (Id.).Afterwards, a nurse examined Plaintiff and declared the restraints on his arms and legs did not prevent circulation. (Id.). Prison medical staff later examined Plaintiff and confirmed that he was not in distress and did not have any injuries. (Doc 35-9, p. 5).

Here, the defendants' motive for restraining Plaintiff were based on legitimate concerns for the safety of the prison staff and of Plaintiff. The level of force applied to Plaintiff was in good faith and below the level of egregiousness necessary to establish any constitutional violation.

The undersigned notes that the Plaintiff's complaints as to Lt. Brinson with regard to this last date actually arise after he was placed in four-point restraints. More particularly, as noted earlier, he alleges that while he was in four-point restraints, Lt. Brinson entered his cell and applied additional restraints with additional pressure around his wrists. Plaintiff further alleges that Lt.

---

[7]Again., the pro se law clerk assigned to this case viewed the video and confirmed that the narrative supplied by Mr. Wilson accurately reflects the contents of the tape.

Brinson placed his entire body weight on his face and head cutting off his breathing. He also alleges that Lt. Brinson placed his fingers inside his ears and pulled on his head causing him additional pain. Plaintiff also alleges that when Lt. Brinson tightened the restraints, he felt the bones in his wrists crack. Additionally, he alleges that Lt. Brinson took his institutional keys and dug them into three of his fingers and the inside of his hands causing them to bleed. Finally, Plaintiff alleges that although medical staff informed Lt. Brinson that the restraints were too tight, he replied that there was nothing he could do. Again, the medical records do not support his claims.

On November 1, 2009, Plaintiff was examined by medical staff at 1:45 p.m. after the forced cell move. Plaintiff was complaining that his foot cuff was too tight. However, medical staff found that all four restraints were in place with good circulation and positive pulses. He could move all extremities. (Doc.35-10, p. 66). On November 2, 2009, Plaintiff was seen by medical staff at 11:43 a.m. His only complaint was that his left shoulder was sore. However, his pulses were normal in both his arms and legs. Accordingly, there is no evidence to support his claims with respect to the plaintiff's allegations against Lt. Brinson.

In conclusion, it is pertinent to note that Plaintiff appears to be a disruptive inmate, who has trouble conforming his behavior to BOP expectations. This is well documented in a mental health status review that was conducted on Plaintiff on October 9, 2009, three days before his "apparent suicide" attempt on October 12, 2009. (Doc.35-10) This report discloses that following Plaintiff's admission to BOP custody in 2003, 22 Suicide Risk Assessments have been conducted across seven institutions. Of the 22 assessments, six involved an actual attempt while the remaining assessment were conducted following the expression of suicidal ideation by the plaintiff to staff. Of the six attempts, three involved placing a noose around his neck in front of staff, two involved ingesting

pills or glass in front of staff, while the remaining attempts involved cutting his forearms with a plastic fork.(Doc. 35-10, p. 336). In August of 2006, while at USP Lewisburg, Plaintiff engaged in a hunger strike that lasted 31 meals. In 2007, again while at USP Lewisburg, he remained in restraints for 19 days following a calculated use of force to remove him and his cell mate from their cell. Moreover, Plaintiff has demonstrated aggressive behaviors from an early age including convictions for battery, strong-armed robbery, and assault all before the age of 14. During a restraint review from September 29, 2009, Plaintiff acknowledged "thought of hanging including his prior hanging behavior at USP Lee and acknowledged that it was and will again be part of his repertoire of disruptive behaviors to demonstrate that he can be more disruptive that we can be punitive to him." (Doc. 35-10, p. 336). In addition, he remained firm in his stance to "tear apart his cell"" and that "it would be on" if removed from restraints. Id. Plaintiff's diagnosis following this evaluation was Axis II; Anti-social personality disorder. (Doc. 35-10, p. 337).In conclusion, this assessment notes that over the course of his incarceration, Plaintiff has become progressively more aggressive in his behaviors and has shown an ability to defeat nearly all types of restraints. Therefore, it recommends the use of sound correctional interventions as the only approach that heresponds to for any period of time.

Therefore, based on Plaintiff's history during his BOP incarceration, the video tapes of the September 19, 2009 incident and November 1, 2009 incident, the affidavits, and medical records, it is clear that no genuine issues of triable fact exist. Therefore, Plaintiff cannot prevail on his claim of excessive force.

## V. Recommendation

For the foregoing reasons, the undersigned recommends that the defendants' Motion to

Dismiss or, in the alternative, Motion for Summary Judgment (Doc. 33) be **GRANTED,** and Plaintiff's complaint be **DISMISSED WITH PREJUDICE.**

Within fourteen (14) days after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections shall also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to the plaintiff's last known address as shown on the docket, and to counsel of record via electronic means.

_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE

**DATED**: July 17, 2012